

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed February 8, 2019**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| MAX LEROY CHRISTIAN and | § | Case No.:  12-20105-RLJ-7 |
| LORI BATIS CHRISTIAN, | § | |
| | § | |
| Debtors. | § | |
| | § | |

## <u>MEMORANDUM OPINION</u>

On December 11, 2018, the Court heard Max and Lori Christian's Motion to Determine the Validity of a Claimed Assignment by Happy State Bank in Life Insurance Policy.[1]  By this motion, the Christians ask that the Court order Happy State Bank (HSB) to formally release an assignment of a life insurance policy that secured the Christians' loan with the bank.  HSB filed its response opposing the motion and, further, asking that the Court allow it to collect the proceeds from the policy upon surrender of the policy.  This dispute arises six years *after* the

---

[1] Doc. No. 30.  All "Doc. No." references herein are to the current chapter 7 bankruptcy case, unless otherwise stated.

1

Christians, as chapter 7 debtors, received their discharge in bankruptcy. For the reasons stated below, the Court denies the Christians' request and both grants in part and denies in part HSB's request.

### Background

The Christians filed their chapter 7 bankruptcy petition on February 29, 2012.[2] Several years prior to their bankruptcy, the Christians assigned, as collateral, the life insurance policy to HSB.[3] The policy is identified as "Policy No. 50 14700IU" and was issued by Southern Farm Bureau Life Insurance.[4] This policy, along with other items of collateral, secured the debts of the Christians to HSB, including a $70,000 promissory note made by the Christians to HSB on August 5, 2011.[5] The current dispute centers on who—HSB or the Christians—is entitled to the proceeds of the life insurance policy now that the Christians seek to redeem the policy for its cash value.

Included with their bankruptcy petition, the Christians filed Schedule B that lists their interests in certain personal property; this schedule included a "Life Insurance Policy" with an assigned value of $16,359.20.[6] Schedule D included HSB as a secured creditor holding several "Purchase Money" liens against personal property, including the life insurance policy.[7] (The Court assumes that HSB's interest in the policy is not a purchase money lien.) On April 26,

---

[2] HSB Ex. 14.
[3] HSB Ex. 2. The assignment is dated April 17, 2006.
[4] *Id.* In subsequent documents, both maintained by HSB and those filed with the Court, the policy number is stated as "50 147001U." The correct policy number, as identified by Southern Farm Bureau Life Insurance Company, is 50 147001U. Debtor Ex. 11.
[5] HSB. Ex. 6.
[6] HSB Ex. 4.
[7] HSB Ex. 5. The Christians listed "ACCT#: 53988" with a claim amount of $70,000 as the note secured by the life insurance policy, among other collateral items. HSB Ex. 14 at 17. The Court questions whether the bank's interest in the policy arose from purchase money despite its notation as such in the Christians' schedules.

2012, the chapter 7 trustee, Kent Ries, filed his report that no distributions to creditors would be made in the case.

HSB and the Christians filed a joint motion for relief from the automatic stay on May 3, 2012.[8] The motion sought to lift the stay as to certain collateral securing HSB's liens.[9] The motion stated, "The Creditor and Debtor request relief from the automatic stay of the Bankruptcy Code for cause under 11 U.S.C. § 362(d)(1) given that the Debtor desires to surrender that certain Collateral listed on **Exhibit I**, and there is no equity in said Collateral listed on **Exhibit I**."[10] Among the items of collateral listed on Exhibit I is the "Southern Farm Bureau Life Insurance Policy," "Pol. # 50 147001U."[11] By agreed order, the joint motion for relief from stay was granted on May 7, 2012.[12]

One month after the stay was lifted on the specified collateral, including the life insurance policy, HSB filed an adversary proceeding against the Christians.[13] HSB asserted a dischargeability claim under 11 U.S.C. § 523, requested declaratory relief, and sought relief from the automatic stay.[14] HSB's complaint stated the following:

> Debtors and HSB have previously filed a Joint Motion for Relief from Automatic Stay which was approved by Agreed Order dated May 4, 2012. This Complaint and Motion, on the other hand, seeks declaration of Debtors' property interest in additional secured assets and relief from stay as to same and is not agreed.[15]

---

[8] Doc. No. 12.

[9] *Id.* at 2. "The Creditor and Debtor are in agreement that certain items of Collateral should be surrendered to Creditor. . . . A detailed list of the items that Debtor and Creditor agree are Collateral is attached hereto as **Exhibit I**." *Id.* (emphasis in original).

[10] *Id.* (emphasis in original).

[11] *Id.* Ex. I.

[12] Debtor Ex. 7. Counsel for HSB stated that Ries was not opposed to the relief sought by the joint motion. The order was signed on May 4, 2012, and entered on the Court's docket on May 7, 2012.

[13] Debtor Ex. 1.

[14] *Id.* All "§" references herein are to Title 11 of the United States Code, unless otherwise stated.

[15] *Id.* at 3.

While the adversary was pending, the Christians received their chapter 7 discharges on June 27, 2012.[16] (The discharge in bankruptcy is issued subject to any timely-filed complaint objecting to dischargeability of a particular debt.) A few months later, HSB and the Christians entered into an agreement that resolved the adversary proceeding.[17] Their joint motion that requested approval of their settlement agreement was granted, with an agreed order entered on November 2, 2012.[18] This agreement provided for mutual releases and dismissal of the adversary proceeding.

Of importance here, the Court-approved settlement agreement contained the following joint releases:

> 4. In return for the good and valuable consideration recited herein:
>
> a. Plaintiff does hereby release and forever discharge Defendants, along with the predecessors, successors, assigns, heirs, executors, administrators, agents, employees, insurers, and legal representatives of each of them, from all liability, claims, demands, damages, actions, or suits, in law or in equity, of any kind or nature, whether heretofore or hereafter accruing, or whether now known or not known to the parties, for or because of anything done or omitted, or suffered to be done, directly or indirectly, before and up to the effective date of this Agreement; and
>
> b. Defendants do hereby release and forever discharge Plaintiff along with its predecessors, successors, assigns, heirs, executors, administrators, agents, employees, insurers, and legal representatives, from all liability, claims, demands, damages, actions, or suits, in law or in equity, of any kind or nature, whether heretofore or hereafter accruing, or whether now known or not known to the parties, for or because of anything done or omitted, or suffered to be done, directly or indirectly, before and up to the effective date of this Agreement.[19]

This language, the Christians argue, prevents HSB from asserting any claim to the life insurance policy, as any such interest was effectively released under the settlement agreement.[20] HSB

---

[16] Debtor Ex. 13.
[17] Debtor Ex. 3.
[18] Debtor Ex. 5.
[19] Debtor Ex. 2 at 3–4.
[20] *See* Doc. No. 30 at 1–2.

counters that the scope of the adversary proceeding specifically excluded the life insurance policy and that the Christians are construing the settlement agreement, and particularly, the joint releases, too broadly.[21]

By their pleadings here, the Christians assert that they received a separate, stand-alone "Release of Assignment of Life Insurance Policy" that was signed by Doak Crabtree, an HSB branch president.[22] HSB, on the other hand, contests the validity of this release both in substance and form.[23] First, HSB alleges that the purported release does not belong with the documents to which it is attached. Second, it says that the signature is not that of Mr. Crabtree's but is instead Dewain Trayler's, another bank officer. And third, it points out that the purported release bears no attestation, date, or corporate seal. Mr. Crabtree credibly testified that the signature appeared to be Mr. Trayler's; he also testified that HSB does not have a copy of this document. It is unclear if the stamped-date, "Nov 27 2006," on the document coincides with the purported release. By all accounts, the authenticity of this document is questionable.

Finally, in support of their claim that they are entitled to the proceeds of the life insurance policy, the Christians note that they have been dutifully making monthly premium payments as required by the insurer.[24] HSB counters that, under the original assignment of life insurance policy, it was under no obligation to make premium payments on the policy.[25] HSB thus contends that the Christians' payment of premiums does not "disqualif[y] HSB's recovery of the proceeds."[26]

---

[21] *See* Doc. No. 33 at 3.
[22] Doc. No. 30 at 2; Debtor Ex. 12.
[23] *See* Doc. No. 33 at 2.
[24] *See* Doc. No. 30 ¶ 10; Debtor Exs. 8, 9, 10.
[25] *See* Doc. No. 33 at 3; HSB Ex. 2 ¶ G.
[26] Doc. No. 33 at 3.

At the hearing, in addition to Mr. Crabtree's testimony, the Court also received testimony from Mr. Christian. At the conclusion of argument and evidence, the Court took the matter under advisement.

### Analysis

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (K).

### A.

The Release of Assignment, if valid, resolves the issues here in favor of the Christians. But its validity has been challenged. First, it is not clear when the release was signed. The Christians, through counsel, argue that the release may have been signed on November 27, 2006, but then state that the insurance company acknowledged the *assignment* in December 2006, *after* the purported release date. Documentation of the claimed acknowledgement was not admitted into evidence. Second, the Christians claim that Doak Crabtree signed the release. Mr. Crabtree's testimony, however, contradicts this. He testified that the signature appears to be that of the Christians' loan officer, Dewain Trayler. Third, the evidence reflects that the Christians pledged the life insurance policy as collateral for an August 5, 2011 loan.[27] Neither HSB nor the Christians produced an original of the purported Release of Assignment. The Court cannot conclude that this document is authentic and thus assigns no weight to it. Indeed, the Christians' main argument is that the release granted them as part of the joint releases *under the parties' settlement agreement* caused HSB to release its interest in the policy.

---

[27] HSB Exs. 6, 7, 8, 9.

**B.**

**1.**

The Court turns to the release under the settlement agreement. Each of HSB and the Christians released the other of "all liability, claims, demands, damages, actions, or suits . . . of any kind . . . ."[28] The Christians argue that the unlimited scope of the release means that HSB effectively released its claim to the life insurance policy.[29] HSB submits that this is an improper reading of the release.[30] It argues that their settlement agreement resolved disputes between the parties that specifically did *not* include any dispute over the life insurance policy. Thus the release language cannot be construed to affect the validity of the bank's interest in the claim against the policy.

Local law, generally applicable to contracts, governs the construction and enforcement of settlement agreements. *Lake Eugenie Land Dev., Inc. v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 785 F.3d 986, 994 (5th Cir. 2015). Here, as noted in paragraph 7.f. of the settlement agreement, Texas contract law is the governing local law. *See Lee v. Hunt*, 631 F.2d 1171, 1176 (5th Cir. Unit A 1980) (noting that all parties to the settlement agreement, save for one, and the property at issue were located in Texas).

The Supreme Court of Texas recently issued an opinion that is helpful in determining the scope of the release under the settlement agreement. In *URI, Inc. v. Kleberg County*, the court said, "When a contract's meaning is disputed, [the court's] primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." 543 S.W.3d 755, 763 (Tex. 2018). Objective intent is considered and contractual language is interpreted "according to its

---

[28] Debtor Ex. 2 at 3–4.
[29] *See* Doc. No. 30 at 1–2.
[30] *See* Doc. No. 33 at 3.

'plain, ordinary, and generally accepted meaning' unless the instrument directs otherwise." *Id.* at

763–64 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).

Objective intent is determined by consideration of the context of the agreement, which

"encompass[es] 'the circumstances present when the contract was entered.'" *Id.* at 764 (quoting

*Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996));

*see also Kanan v. Plantation Homeowner's Ass'n*, 407 S.W.3d 320, 328 (Tex. App.—Corpus

Christi 2013, no pet.) (instructing that circumstances surrounding a settlement agreement also

include "the state of the pleadings [and] the allegations therein"). The analysis, therefore, shifts

to determine what role the surrounding circumstances—facts and circumstances that existed at

formation of the agreement—play in construing the settlement agreement. *URI*, 543 S.W.3d at

764. Consideration of the then-existing facts and circumstances does not run afoul of the parol

evidence rule so long as such context "elucidates the meaning of the words" of the contract "and

nothing else." *Id*. at 765. The purpose is to discern the parties' intent as expressed under the

agreement.

The settlement agreement itself provides context. Its recitals state that HSB filed its

complaint seeking a determination of the dischargeability of its debt under § 523 and relief from

the automatic stay. In particular, it stated that the "disputes and controversies" resolved by the

agreement concerned the "dischargeability of [d]ebt."[31]

The May 3, 2012 joint motion for stay relief, the agreed order on such motion, and HSB's

complaint that initiated the adversary proceeding also provide context to the parties' settlement

agreement and further inform its terms. And they do so by not altering or inserting ambiguity

into the terms of the agreement. The joint motion stated that HSB and the Christians agreed that

---

[31] Debtor Ex. 2 at 2.

the stay would be lifted and that certain items of HSB's collateral—including the life insurance policy—would be surrendered by the Christians.[32]  The agreed order confirmed and directed the parties' agreement.  Then, a month later, HSB's complaint referenced the joint motion and agreed order and clarified that it addressed "additional secured assets" to those covered by the joint motion and agreed order.[33]

The settlement agreement and, in particular, its joint release provision are not ambiguous. The settlement agreement addressed the dischargeability of the Christians' debt to HSB and whether the stay should be lifted to the *other* collateral, i.e., the collateral that was *not* subject of the prior joint stay motion and agreed order.  Though the release language is broad and all-encompassing, it must be considered within the confines of the entire agreement.  The parties' settlement agreement resolved the dischargeability of the Christians' debt to HSB and the parties' dispute concerning collateral not previously addressed.

For the specified consideration from the Christians, HSB agreed to release and discharge the balance of the Christians' debt to the bank.  The release language does not state that the bank's interest in the insurance policy, which had already been dealt with, was released or waived.  The extant facts and circumstances confirm this construction of the settlement and the language of the release.

**2.**

Although not critical to the Court's analysis, Mr. Crabtree testified to why HSB did not immediately liquidate the life insurance policy upon lifting of the stay.  He stated that the bank made a business decision to hold the policy and thus potentially realize more value on its collateral.  (It is not clear from the evidence if HSB, between May 7, 2012 and the filing date of

---

[32] Doc. No. 12 at 2, Ex. I.
[33] Debtor Ex. 1, ¶ 6.

the adversary proceeding, June 7, 2012, liquidated the other collateral (other than the life

insurance policy) addressed by the joint stay motion.)

**3.**

In support of their position, the Christians state that they had, since the assignment of the

policy, made all monthly premium payments to the insurer.[34]  This argument is an equitable one.

Importantly, however, the assignment signed by the Christians and HSB specifically provides

that HSB is not required to make premium payments.[35]  The evidence reveals that the Christians

did indeed make monthly premium payments in an amount between $74 and $80 from

November 2012 to December 2018.[36]  Eighty-one months have passed since the stay was lifted

on the life insurance policy on May 7, 2012.  Had the Christians discontinued payment of the

monthly premium when the life insurance policy was surrendered under the Court's order in

2012, HSB would have needed to either make the continuing premium payments (while it

considered its options) or cash-in the policy for its value at that time to avoid cancellation of the

policy.[37]  While sympathetic to the Christians' position, the Court notes that its equitable powers

are not limitless.  *See, e.g.*, *UTSA Apartments, L.L.C. v. UTSA Apartments 8, L.L.C. (In re UTSA

Apartments 8, L.L.C.)*, 886 F.3d 473, 485–91 (5th Cir. 2018) (reversing the bankruptcy court's

decision to equitably reduce a creditor's recovery and writing, "the broad powers of bankruptcy

courts to fashion equitable remedies . . .  must be exercised only within the confines of the

Bankruptcy Code.") (quoting *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426,

---

[34] *See* Debtor Exs. 8, 9, 10.
[35] HSB Ex. 2 ¶ G.
[36] *See* Debtor Exs. 8, 9, 10.
[37] The assignment is silent regarding what happens when the assignors (the Christians) fail to make premium payments, other than stating that if the assignee (HSB) makes any payment from its own funds, such amount will be added to the indebtedness owed by the assignors.  HSB Ex. 2 ¶ G.

442–43 (5th Cir. 1994)).  That the Christians made the premium payments does not alter HSB's rights.

### C.

Last, the Court addresses HSB's request for payment of its attorney's fees for having to defend against the Christians' motion.[38]  HSB says that it is entitled to recover its attorney's fees "as a matter of contract."[39]  HSB relies on the promissory note, which allows collection of attorneys' fees and expenses incurred collecting on the note.[40]

The Supreme Court, in *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, considered "whether federal bankruptcy law precludes an unsecured creditor from recovering attorney's fees authorized by a prepetition contract and incurred in postpetition litigation."  549 U.S. 443, 445 (2007).  In so doing, the Supreme Court rejected a judicially-created rule that prohibited an award of attorney's fees if the postpetition litigation involved issues of bankruptcy law.  *Id.* (abrogating the *Fobian* rule established by *Fobian v. W. Farm Credit Bank (In re Fobian)*, 951 F.2d 1149 (9th Cir. 1991)).  Thus, where the requested fees are not disallowed by one or more of the enumerated exceptions of § 502, the Court concluded that a claim for attorney's fees is not disallowed solely because the fees were incurred by litigating issues of bankruptcy law.  *Id.* at 449–54.  But the Court also recognized that other provisions of the Bankruptcy Code might disallow an unsecured creditor's claim for postpetition attorney's fees, namely § 506(b), but declined to express an opinion on the effect of § 506(b) on the case before it because it was not raised or addressed with the lower courts.  *Id.* at 455.

---

[38] Doc. No. 33 at 3 ¶ 14.
[39] *Id.*
[40] HSB Ex. 6.

This Court has addressed the effect of § 506(b) on an unsecured creditor's claim for postpetition attorney's fees. *See Pride Cos. v. Johnson (In re Pride Cos.)*, 285 B.R. 366 (Bankr. N.D. Tex. 2002). In *Pride*, the Court considered both the majority and minority opinions on the issue and concluded that an unsecured creditor is not entitled to recover its postpetition fees from the debtor's estate. *Id.* at 370–77 (collecting cases). In accord with the majority opinions' analysis, the Court relied on four arguments to reach its conclusions. *Id.* at 372–74. First, as § 506(b) permits *oversecured creditors* to recover their postpetition attorney's fees, it follows that such language prevents *unsecured or undersecured creditors* from recovering such fees. *Id.* at 372. Second, and relying on the Supreme Court's *Timbers* decision that denied recovery of an unsecured creditor's postpetition interest on its claim, the Court inferred that an unsecured creditor's attorney's fees are non-recoverable because "[§] 506(b) speaks identically to attorney's fees as it does to interest." *Id.* at 372–73 (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372–73 (1988)). Third, a creditor's claim is calculated at the date of filing, and "attorney's fees incurred after the filing cannot become part of the claim (except, of course, with respect to oversecured creditors pursuant to [§] 506(b))" *Id.* at 373. Fourth, and finally, as a policy reason, "[a]llowing unsecured creditors to recover postpetition fees is inequitable to other unsecured creditors and may, in some cases, consume the estate." *Id*. This is so even if an unsecured creditor's attorney's fees arise as a matter of contract. "[B]ankruptcy routinely alters creditors rights, and this is simply a situation where the policy of ratable distribution and equitable treatment of the varying interests in bankruptcy should override any asserted rights by unsecured creditors to recover attorney's fees." *Id.* at 374.

Here, and most important, an analysis under § 506(b) is unnecessary. *See* Collier on Bankruptcy ¶ 506.04[3][a] (Richard Levin & Henry J. Sommer eds., 16th ed.). HSB was an

undersecured creditor; the cash value of the subject life insurance policy is $16,345.44,[41] and Mr. Crabtree testified that HSB suffered a $500,000 loss when it liquidated its collateral several years prior. The Christians' case was closed as a no-asset case on December 21, 2012. No distributions were made to unsecured creditors, and there are no new assets to liquidate for the benefit of unsecured creditors. HSB may recover the cash value of the life insurance proceeds; nothing will be left with which to pay unsecured creditors. HSB's request for payment of its attorney's fees is denied.

## Conclusion

The Court denies the Christians' motion and concludes that HSB may collect the cash proceeds of the life insurance policy that are realized upon its surrender. HSB's request for attorney's fees is denied.

### End of Memorandum Opinion ###

---

[41] Debtor Ex. 11. This value was calculated as of May 14, 2018.